**Michael A. RIVAS, Appellant**

**The STATE of Texas, Appellee**

**No. 04–14–00181–CR**

Court of Appeals of Texas,
San Antonio.

Delivered and Filed: February 3, 2016

Discretionary Review Refused
May 4, 2016

Michael C. Gross, Gross & Esparza, P.L.L.C., San Antonio, TX, for Appellant Attorney.

Christina Busbee, Assistant District Attorney, Hondo, TX, for Appellee Attorney.

Sitting: Rebeca C. Martinez, Justice Patricia O. Alvarez, Justice Luz Elena D. Chapa, Justice

## OPINION

Opinion by: Patricia O. Alvarez, Justice

On January 22, 2014, a Medina County jury found Appellant Michael Rivas guilty of murder, aggravated assault with a deadly weapon, and criminal conspiracy relating to the death of Felix Flores. Michael[1] was sentenced to life imprisonment in the Institutional Division of the Texas Department of Criminal Justice. On appeal, Michael argues (1) the trial court's jury instruction fails to accurately apply the law of self-defense to the facts of the case, (2) the trial court's jury instruction fails to accurately apply the law of parties to the facts of the case, and (3) the record fails to establish Michael's ability to pay attorney's fees as required by the judgment.

Because the trial court found Michael indigent, and the record does not substantiate a material change in Michael's financial situation, we reform the judgment to delete the assessment of attorney's fees. We overrule Michael's other issues and affirm the trial court's judgment as reformed.

### FACTUAL AND PROCEDURAL BACKGROUND

Felix Flores was shot to death on October 15, 2011. The evidence is uncontested that the fatal shots were fired from a vehicle being driven by Michael and that Michael's brother, Leonardo, was in the front, passenger seat. At trial, the State argued Felix was shot while standing in the driveway, without provocation. Michael contended that Felix attacked Leonardo, and that Leonardo shot Felix in self-defense.

The jury heard from twenty-two witnesses and over 140 exhibits were admitted into evidence. Because Michael challenges the sufficiency of the evidence, and the jury charge's instruction on self-defense is at issue, a more detailed description of the events is provided below.

## A. State's Witnesses

### 1. Johnny Joe Flores

Johnny Joe Flores, Felix Flores's brother, testified that Felix went by the nickname "Chape."[2] Shortly before 1:00 a.m. on October 15, 2011, Felix came by the restaurant at which Johnny Joe, Margie Gonzales, and Felix's girlfriend, Janie Aguilar, all worked. Approximately fifteen minutes later, after Felix left to pick up cigarettes, Johnny Joe left the restaurant with Margie and Janie. Shortly after the three arrived at Johnny Joe's residence, Felix arrived. Felix was very upset and had a "big bump" above his right eye.

All four individuals were standing by the front stairs of the house, eating tacos and drinking beer. Johnny Joe testified that Felix stood up and pointed toward a black Ford Expedition, stopped at the property line, and said, "That's them." Simultaneously, one of the male occupants in the Expedition yelled, "that's him right there."

Johnny Joe testified there were three individuals in the Expedition: Michael Rivas, in the driver's seat; Leonardo Rivas, in the front passenger seat; and a female in the back seat. Johnny Joe further testified that Leonardo began firing and, although Johnny Joe told Felix to jump, Felix was struck by the gunfire. Only after the Expedition sped away did Johnny Joe realize he had also been shot.

---

1. Because Michael and Leonardo Rivas were tried together, and the recitation of the facts requires a distinction between each individual's actions, we refer to Appellant Michael Rivas as "Michael" throughout this appeal.

2. Although many of the witnesses refer to Felix Flores as Chape, we use his given name throughout this opinion.

### 2. Margie Gonzales

Margie Gonzales, Johnny Joe's wife, was also present at the time of the shooting. Margie testified that Felix came by the restaurant earlier in the evening to see Janie. Felix left to buy cigarettes; and, shortly after 1:00 a.m., Margie, Janie, and Johnny Joe left the restaurant heading to Margie and Johnny Joe's house. Felix arrived a few minutes after they did. Margie testified that the four individuals sat out front drinking beer and eating tacos. She also testified to seeing a knot on the side of Felix's head.

Shortly after Felix arrived, Margie testified that Michael and Leonardo Rivas drove up in a black Expedition. Felix raised his hands and asked, "Que onda?" ("What's going on?") Margie explained that it appeared as if Leonardo, who was in the front passenger seat, was going to exit the vehicle, "but they pulled out a gun and started shooting." On further clarification, Margie testified that Leonardo shot first and then Michael began shooting.

Margie described the vehicle as having the front windows open and the back passenger window "halfway open." Through the window, Margie could see a female in the back seat. Margie denied that either Felix or Johnny Joe were holding a knife, gun, or broken beer bottle or that they made any aggressive actions toward the people in the Expedition.

Margie testified the next thing she remembered was shots being fired. She described herself as standing there, staring, and in shock, when "I saw [Felix] just getting hit with his arms extended, he just went like two steps back and he fell." Johnny Joe pushed Margie out of the way, but his screams for Felix to jump were too late. It was not until later that Margie or Johnny Joe realized that Johnny Joe was also struck by a bullet.

### 3. Dr. Randy Frost

Dr. Randy Frost, the Chief Medical Examiner for Bexar County, testified Felix Flores had a total of nine gunshot wounds to his body. Dr. Frost also described an abrasion, approximately three and a half by two inches, on his left upper forehead area with evidence of bruising and hemorrhage beneath it.

With regard to the distance from which the firearm was discharged, Dr. Frost testified there was no evidence of stippling or soot surrounding Felix's wounds. "With typical handguns we'll see stippling out to around two feet, maybe three feet from the muzzle. Soot is much closer. Soot we don't see past a few inches." Dr. Frost acknowledged this was consistent with the property description and witness testimony that the Expedition stopped at the property line, approximately eleven feet away from where Felix was standing. Because he was not given any information whether the shooter or the victim were moving at the time of impact, Dr. Frost could not testify as to Felix's posture when he was shot. He did opine, however, that he "would expect that gunshot [to the head] would drop him to the ground where he stood. I wouldn't expect any further movement from him unless it was some reflex activity."

### 4. Hondo Police Officers

Most of the officers knew many, if not all, of the individuals involved. Additionally, during their investigation and collection of evidence, none of the officers saw any evidence of a knife, a firearm, or a broken beer bottle at or near Margie and Johnny Joe's residence.

#### a. Officer Ramiro Guedea

Hondo Police Officer Ramiro Guedea arrived at the residence at approximately 1:30 a.m. He described the scene as very

chaotic, with people yelling and screaming. Officer Guedea first approached the male subject laying on the ground. After determining that he could not provide aid, Officer Guedea waited for EMS, and assisted in securing the scene, making "sure nobody would come in or out of that scene." Several witnesses identified the shooters as Michael and Leonardo Rivas.

Sergeant Brian Valenzuela directed Officer Guedea to report to 2503 Avenue E, a residence owned by John Benavides. Officer Guedea was the first officer at the residence. He located the black Expedition and ensured that no one left the house or moved the vehicle. Approximately thirty to forty-five minutes later, Sergeant Valenzuela arrived and knocked on the back door. Sergeant Valenzuela spoke to a female and then her father, John Benavides exited the home. Officer Guedea was instructed to drive the Expedition from the Benavides residence to the Hondo Police Department where the vehicle was secured and the keys were given to Sergeant Valenzuela.

### b. *Sergeant Brian Valenzuela*

Hondo Police Sergeant Brian Valenzuela described the scene when he arrived as "basically chaos." Several witnesses identified Michael and Leonardo Rivas as the shooters. Sergeant Valenzuela knew all of the parties involved and was able to connect the black Expedition with Michael Rivas's girlfriend, Adriana Benavides. Sergeant Valenzuela provided Officer Guedea with the Benavides address and instructed him to check the area in an attempt to locate the vehicle in question. Approximately thirty minutes later, Sergeant Valenzuela arrived at the Benavides's residence where Officer Guedea had secured the vehicle.

Sergeant Valenzuela approached the back door of the residence and spoke with Adriana's father, John Benavides. Sergeant Valenzuela explained his belief that the black Expedition was involved in a shooting earlier in the evening. Adriana, who was very upset and crying, "blurted out that she was in the back seat of the vehicle during the shooting, that [Leonardo] Rivas had pulled the trigger." Adriana also identified Michael as the vehicle's driver. John Benavides voluntarily released the vehicle to the officer and provided keys for transport.

### c. *Detective Joann Evans*

Hondo Detective Joann Evans arrived after EMS had left, and the scene was calmer. She began locating evidence, and photographing the evidence, in the location in which it was found. In addition to photographically documenting the scene, Detective Evans testified that the officers recovered fourteen shell casings and three bullets.

Several witnesses and officers testified that one of the bullets was discovered lodged in the mattress in the bedroom belonging to one of Margie and Johnny Joe's sons. No traces of blood or other evidence of a struggle was found in or around the area where the Expedition was located when the shots were fired.

### d. *Officer Laura Morris*

Hondo Police Officer Laura Morris testified that approximately three months after the incident, she was dispatched to a residence where the owner reported a handgun was found on his property. The officer took possession of a stainless steel semi-automatic, nine-millimeter Ruger firearm. The homeowner led Officer Morris to the location in his backyard, on the west property line, where the firearm was found. When further questioned, the homeowner acknowledged Leonardo Rivas's home also shared the same fence line.

### e. *Detective Sergeant Ricardo Garza Jr.*

Hondo Police Detective Sergeant Ricardo Garza Jr. testified regarding the Mexican Mafia and its hierarchy. He opined that Michael Rivas was in the Mexican Mafia. In addition to personal knowledge, and photographs of Michael Rivas with known gang members, Detective Sergeant Garza identified the tattoos on either side of Michael's neck as evidence of membership in the Mexican Mafia.

### 5. *Michelle Benavides*

Michelle Benavides, Margie and Johnny Joe's niece, was a neighbor to Michael and Leonardo. She testified that on the night in question, she saw Michael, Leonardo, and Adriana fighting near Adriana's black SUV. Leonardo was standing on the passenger side and Michael was on the driver's side.

Michelle relayed the following conversation between the brothers: Leonardo said, "F* *k them. I already told these mother f* *kers they're not going to f* *k with us." Michelle could not hear what Michael said, but she heard Leonardo respond, "F* *k that, Bro. F* *k that sh*t. I'm tired of their sh*t." Shortly thereafter, she heard Michael tell a hysterical Adriana to, "Just get the f* *k in the car." Michelle described Adriana as looking scared, "[b]y the looks of it she didn't want to go."

Stephen Rodriguez, Michelle's ex-husband, was also at her residence. He testified to hearing the same conversation and then, "I heard a weapon . . . I heard somebody load a clip and pull back the chamber so I made my kids go inside." Within a couple of minutes, Michelle and Stephen heard shots fired.

### 6. *Adriana Benavides*

Adriana Benavides was dating Michael at the time of the incident. They were in Adriana's parents' black Expedition when they went to Leonardo's residence. Adriana testified that after driving around, the three individuals ultimately ended up drinking at Jaime Escamilla's house with a group of people.

At some point during the evening, Adriana left with Michael and Adrienne Lopez to meet Armando Garcia at the park on 18th Street. Garcia was allegedly saying that Adriana stole $300.00 worth of cocaine. Once there, Adriana saw Michael and Eusebio Luna "Chevio" in an argument. The argument settled down and they were going their separate ways when a white van pulled up. Adriana did not recognize the man that exited the van, but she saw him approach Michael to start a fight. When the driver of the van fell, she and Michael took off.

When she and Michael arrived back at Jamie's house, Adriana testified that she was crying because she was scared, but that Michael was mad. Because she knew that Michael "gets real mean" when he is mad, she stayed away from him.

After Leonardo arrived back at the house, Leonardo, and a still very angry Michael, exchanged words. Adriana was still crying, and Michael was still pacing, when Adriana saw Leonardo exit the trailer with a gun tucked into the waistband of his pants. Michael instructed Adriana to get into the Expedition and she complied. Michael was driving and Leonardo was in the front passenger seat. While driving, Adriana heard Leonardo tell Michael, "I'm going to make you a believer."

When they arrived on 11th Street, Michael pulled into the driveway of one of Adriana's friends and instructed her to ring the doorbell. When no one was home, Michael then drove further through the neighborhood. Adriana testified that Michael pulled into a residence, but she did not know whose house it was. She did recognize one of the men, later identified

as Felix, as one of the individuals from the park on 18th Street. She saw Felix with his hands up, in a non-aggressive manner. He said something in Spanish, but Adriana did not know what he said. Adriana then testified Leonardo began shooting with his hand outside of the Expedition. She could not remember specifics, but remembered seeing one of the shots hit Felix in the stomach and then watching him fall to the ground. She did not see what Michael was doing during the shooting. The next thing she could remember was looking back at Felix, on the ground, surrounded by blood, as Michael drove away. They drove to Leonardo's trailer and Michael instructed her to leave and to take the Expedition home.

Shortly after Adriana arrived home, Sergeant Valenzuela was knocking on her back door. During her statement to officers, Adriana testified that Felix stabbed Leonardo. Before the jury, however, Adriana acknowledged lying to the officers in an attempt to "stick up for [Leonardo], Michael and me." She further testified that she did not see knives, guns, or beer bottles when they drove up to the residence.

### 7. Janie Aguilar

Janie had been dating Felix for approximately three years before he was shot. Felix had come by the restaurant before she was off work and told her that he would meet her at Johnny Joe's house. When Felix arrived at Johnny Joe's, Janie noticed a bump on his forehead. She identified Felix's vehicle as a white van. Janie testified that she saw a black Expedition pull into the yard. According to Janie, the two men acted like they were going to get out of the Expedition when the driver and the front passenger suddenly started shooting. The passenger started shooting and then leaned back and the driver reached over him and started shooting.

Janie could not recall how many shots were fired. She just remembered watching Felix get hit and then falling to the ground.

Following Janie's testimony, the State rested.

### B. Defense Witnesses

#### 1. Michael Rivas

Michael testified that he was previously convicted of drug charges and a felony possession case in Medina County and acknowledged spending time in both the Texas prison system and the Medina County jail.

On the day in question, Michael was with his brother Leonardo, and his girlfriend Adriana, at the Mexican restaurant where Margie, Johnny Joe, and Janie all worked. After dinner, they went back to Leonardo's trailer and ultimately to the grocery store to purchase beer. After "cruising" for a while, he and Adriana ultimately ended up at a party at Jaime Escamilla's house and celebrated Michael's enrollment in college. Adriana started receiving text messages calling Michael names and accusing him of "being involved" with Adriana in the stealing of drugs.

Although Michael acknowledged having been in the Mexican Mafia and attaining the level of "Prospect," he was adamant that by October 14, 2011, he was out of the gang. Michael testified that his initial interaction with the Mexican Mafia was while he was incarcerated in the Texas Department of Criminal Justice for felony possession of a firearm. He explained, however, that he was "Xed out" because he was a drug addict. Michael further relayed that he had been released from the Substance Abuse Felony Punishment, a rehabilitation facility within the Texas Department of Criminal Justice, on October

6, 2011, only eight days before the shooting.

On October 14, 2011, Michael received a call from Chevio instructing him to go to the park on 18th Street to explain some missing drugs. Michael knew Chevio from his involvement in the Mexican Mafia. Michael explained that if he failed to do what "they" asked, they would show up at his house and that was to be avoided. He opined that his goal in going to the park was to tell Chevio that he did not have anything to do with the missing drugs.

When Michael arrived at the park, Chevio, Stephen Lopez, and several other members of the Mexican Mafia were there. One of the last people to arrive was Felix Flores. Michael testified that he learned from Felix personally that Felix was a member of the Mexican Mafia. Chevio said, "Do what y'all are going to do," and several of the individuals at the park started attacking Michael. According to Michael, he was stabbed three times during the fight. He ran away and Adriana picked him up and they went back to Jaime's house.

At some point, they decided to leave Jaime's house. Michael was driving the Expedition, Leonardo was in the front passenger seat, and Adriana in the back passenger seat. He knew his brother was carrying a gun. They cruised around and when they were stopped at the stop sign in front of Johnny Joe's house, Michael remembered hearing a male person yell. By the time he turned around, he saw Felix and Johnny Joe approach the vehicle and Felix was at the front window attacking Leonardo. He saw Felix had something in his hand, but he did not know what it was. Then he heard shots fired by Leonardo. Michael was adamant that he did not fire a weapon.

After the shots were fired, Michael described Leonardo as very distraught. He drove to Leonardo's house and they both exited the vehicle and he instructed Adriana to go home. His brother was inside and Michael went down to his friend's house and sat on the porch for a while. From there he went to San Antonio and stayed in San Antonio until he was arrested. Michael conceded that he never sought medical treatment for his injuries sustained at the park on 18th Street.

### 2. Leonardo Rivas

Leonardo Rivas testified that he spent the day on October 14, 2011, with his brother Michael, looking at Southwest Texas Junior College. He met up with Michael and Adriana after dinner. Their original plans were to go bowling, but at some point they changed their minds and went to a party at Jaime Escamilla's. Leonardo testified that Michael told him he was leaving and that he would be back. He came back around 1:00 a.m.

Upon his return, Leonardo described Michael as bleeding from his neck, chest, and back of his neck and said that Michael was scared. Leonardo offered to take him to the hospital, but Michael refused. He and Michael left the party with Adriana and they were driving around. Leonardo was trying to convince Michael to drive to his sister's house so that he could get Michael cleaned up. Michael refused saying "They know where you live. They'll come. That's the first place they're going to come."

When they stopped at the stop sign at 12th and P Street, Leonardo heard Adriana screaming "Look out!" He turned and saw Felix at the window swinging at him. "One minute she's screaming, next minute I'm looking and he's swinging at me." Leonardo described putting up his hand to try to catch the punch when he felt where Felix stabbed him. Leonardo said that he instinctively "jumped towards the middle

console and I grabbed the firearm from in between the seat in the console." Leonardo further testified that he shot to fend Felix off. Finally, Leonardo testified that neither Adriana nor Michael knew he had a gun with him in the Expedition. He was the only one with a weapon and the only one that fired at Felix.

### 3. Juliana Jasso

Juliana Jasso, Leonardo's on-again, off-again girlfriend, testified that when she saw Leonardo at approximately 1:30 a.m. on October 15, 2011, Leonardo appeared shell-shocked. Leonardo called her and she picked him up in her father's truck. She only learned about his injuries the following day when her father noticed blood in the back seat of the truck.

Her father, Pedro Saldivar, subsequently testified to finding the blood stains on the back right passenger seat while cleaning his truck.

### 4. Adrienne Lopez

Adrienne Lopez testified that on October 14, 2011, Michael and Adriana picked her up at the party at Jaime's house. Adrienne testified that Adriana kept talking to someone on the phone and they finally decided to go talk in person. Adrienne claimed the argument was about Adriana sleeping with Michael and this other guy at the same time. Adrienne was sitting in the back passenger seat behind Michael and Adriana was driving. They stopped at the park on 18th Street; and, shortly after Michael exited the vehicle, "all of these guys from the house ran across and they jumped Michael." She saw two people with knives. On cross-examination, Adrienne conceded that she was in a romantic relationship with Leonardo on the day in question.

### C. State's Rebuttal Witnesses

The State recalled Margie Gonzales in an attempt to discredit Michael and Leo-nardo's version of the events in front of Johnny Joe's house. Margie testified that Felix was left-handed.

The State also recalled Detective Sergeant Rick Garza. Detective Sergeant Garza identified the clothing worn by Michael Rivas at the time of his arrest. He further testified that Michael told him he was wearing the same clothes he was wearing the night he was assaulted at the park on 18th Street. Although everyone agreed the clothes had been washed several times, and blood stains could have been washed away, Detective Sergeant Garza clarified the clothes were clearly not torn or ripped. Furthermore, Detective Sergeant Garza relayed that both brothers asserted they were stabbed either late October 14th or in the early morning hours of October 15th, but the only visible injuries on either Michael or Leonardo were minor abrasions.

## PROCEDURAL HISTORY

Michael and Leonardo Rivas were indicted on charges of murder and aggravated assault with a deadly weapon. Approximately one month later, the State returned additional indictments alleging criminal conspiracy. The indictments were consolidated and Michael and Leonardo were tried together. After a jury trial, both brothers were found guilty of the offenses of murder, aggravated assault with a deadly weapon, and criminal conspiracy.

Michael now appeals arguing the trial court erred when it (1) failed to adequately instruct the jury on reasonable doubt on the issue of self-defense and failed to fully apply the law of self-defense to the facts of the case in the application paragraph, (2) failed to fully apply the law of parties to the facts of the case in the application paragraph, and (3) improperly imposed a

judgment requiring Michael to pay his court appointed attorney's fees.

## JURY INSTRUCTIONS

### A. Jury Charge

■ "The jury charge is the means by which a judge instructs the jurors on the applicable law." *Vogt v. State,* 421 S.W.3d 233, 238–39 (Tex.App.–San Antonio 2013, pet. ref'd) (citing *Vasquez v. State,* 389 S.W.3d 361, 366 (Tex.Crim.App.2012)). The charge " 'must contain an accurate statement of the law and must set out all the essential elements of the offense.' " *Vasquez,* 389 S.W.3d at 366 (quoting *Dinkins v. State,* 894 S.W.2d 330, 339 (Tex. Crim.App.1995)); *see also Abdnor v. State,* 871 S.W.2d 726, 731 (Tex.Crim.App.1994). The jury charge should be written "in accordance with the indictment." *Yzaguirre v. State,* 394 S.W.3d 526, 530 (Tex. Crim.App.2013). " 'It is not the function of the charge merely to avoid misleading or confusing the jury: it is the function of the charge to lead and to prevent confusion.' " *Reeves v. State,* 420 S.W.3d 812, 817–19 (Tex.Crim.App.2013) (quoting *Williams v. State,* 547 S.W.2d 18, 20 (Tex.Crim.App. 1977)).

■ An application paragraph accompanies the abstract portion of a charge, applying the specific charges alleged against the defendant with the evidence presented at trial. *See id.* at 817; *see also Vasquez,* 389 S.W.3d at 367. The application paragraph must: "(1) specify all conditions which the jury must determine were met before a conviction under such theory is authorized, (2) authorize a conviction under conditions specified by other paragraph of the jury charge to which the application paragraph necessarily and unambiguously refers," *Vogt,* 421 S.W.3d at 239, or "(3) contain[ ] some logically consistent combination of such paragraphs," *Vasquez,* 389 S.W.3d at 367 (internal quotations omitted); *accord Dinkins,* 894 S.W.2d at 339. In short, the application paragraph must "apply the law to the facts adduced at trial." *Gray v. State,* 152 S.W.3d 125, 127 (Tex.Crim.App.2004).

### B. Standard of Review

Appellate courts review potential jury charge errors in a two-step process. *See Hines v. State,* 383 S.W.3d 615, 626 (Tex. App.–San Antonio 2012, pet. ref'd) (citing *Kirsch v. State,* 357 S.W.3d 645, 649 (Tex. Crim.App.2012). The appellate court must first determine whether the charge is erroneous. *Kirsch,* 357 S.W.3d at 649. If error exists, the court analyzes the level of harm incurred by the defendant; the level of harm is contingent on whether the error was preserved. *Id.*

■ If error was preserved, the defendant need only show he suffered "some harm" to prevail on appeal. *Reeves,* 420 S.W.3d at 816; *see also Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1985) (op. on reh'g), *superseded on other grounds by rule as stated in Rodriguez v. State,* 758 S.W.2d 787, 788 (Tex.Crim.App. 1988)). "Neither the State nor the defendant has a burden to prove harm." *Reeves,* 420 S.W.3d at 816. To determine "some harm," the appellate court evaluates "(1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record." *Id.* (citing *Wooten v. State,* 400 S.W.3d 601, 606 (Tex.Crim. App.2013)); *see also Segovia v. State,* 467 S.W.3d 545, 556 (Tex.App.–San Antonio 2015, pet. ref'd).

■ By contrast, if the defendant did not preserve error, the defendant must "show that the error was 'fundamental' and that he suffered 'egregious harm.' " *Reeves,* 420 S.W.3d at 816 (quoting *Almanza,* 686 S.W.2d at 171). " 'This is a high

and difficult standard which must be borne out by the trial record.'" *Id.* (quoting *Young v. State*, 283 S.W.3d 854, 880 (Tex. Crim.App.2009) (Cochran, J. concurring)). An error in the charge is egregious only if it "affect[s] 'the very basis of the case,' deprive[s] the defendant of a 'valuable right,' or 'vitally affect[s] a defensive theory.'" *Hutch v. State*, 922 S.W.2d 166, 170 (Tex.Crim.App.1996) (quoting *Almanza*, 686 S.W.2d at 172).

## C. Self–Defense Instruction

### 1. Arguments on Appeal

Michael argues the trial court erred in submitting a jury charge that (1) failed to "inform the jury that a reasonable doubt on the issue of self-defense requires that the Appellant be acquitted," and (2) did not contain an adequate application paragraph on the issue of self-defense.

The State counters that Michael objected to the language in the original proposed charge, which "may have been more appropriate than that contained in the court's final charge." However, the final jury charge, which partially reflected Rivas's requested changes, went unchallenged.

### 2. Self–Defense Application Paragraph Requirements

■■■ Texas law requires a trial court to submit a charge to the jury setting forth " 'the law applicable to the case.' " *Druery v. State*, 225 S.W.3d 491, 505 (Tex.Crim. App.2007) (quoting TEX.CODE CRIM. PROC. ANN. art. 36.14). "[T]he failure to apply the law of self-defense to the facts of the case and to instruct the jury to acquit if they held a reasonable doubt on self-defense [is] error." *Barrera v. State*, 982 S.W.2d 415, 416 (Tex.Crim.App.1998); *see Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim.App.2013). The charge must apply the law to the facts adduced at trial because the jury must be instructed under

what circumstances to convict or acquit. *Gray*, 152 S.W.3d at 127–28 (citing *Jackson v. State*, 633 S.W.2d 897, 899 (Tex. Crim.App. [Panel Op.] 1982)); *see also* TEX. PENAL CODE ANN. § 2.03(d) (West 2011) ("If the issue of the existence of a defense is submitted to the jury, the court shall charge that a reasonable doubt on the issue requires that the defendant be acquitted").

### 3. Error Analysis

■ ■■ In a four-page section, the jury charge included a full and comprehensive explanation of the affirmative defense of self-defense. The charge's application as to murder read as follows:

> Bearing in mind the foregoing instructions, on the issue of self-defense, only if you find that the defendant, LEONARDO RIVAS and/or MICHAEL A. RIVAS, was not justified in using deadly force, if any, against Felix Flores; as explained herein, may you find the defendant guilty of murder as alleged in the indictment.

A subsequent paragraph on the following page instructed the jury on the aggravated assault charge:

> Now, bearing in mind the foregoing instructions and definitions, including the instruction above regarding self-defense, you find *beyond a reasonable doubt* that, in Medina County, Texas, on or about October 15, A.D.2011, the defendant, MICHAEL A. RIVAS, did then and there, acting alone or as a party to the offense, intentionally, knowingly, or recklessly cause bodily injury to Johnny Joe Flores, by shooting him with a firearm, and the defendant did then and there use or exhibit a deadly weapon, to wit: a handgun, then you will find the defendant guilty of the offense of Aggravated Assault With a Deadly Weapon; *but if you do not so find, or if you have*

*a reasonable doubt thereof you will acquit the defendant, and say by your verdict not guilty.* (emphasis added.)

Here, unlike the application paragraph for aggravated assault, the application paragraph for murder did not apply the self-defense law to the facts adduced at the trial, and it did not instruct the jurors to acquit if they held a reasonable doubt on self-defense. We, therefore, conclude the jury charge contained error. *See Barrera,* 982 S.W.2d at 416; *see also Gray,* 152 S.W.3d at 127–28.

*4. Harm Analysis*

 Michael objected to the self-defense application paragraph during the charge conference on January 21, 2014, and thereby preserved error.

> Defense: And then it goes on to say and I could be off my mark here but I'm just confused by it. It says: "Bearing in mind the foregoing instructions on the issue of deadly force in defense of person, you must find that the Defendant Michael Rivas and/or Leonardo Rivas was not justified in using deadly force, if any, against Felix Flores but if you do not so find or if you have a reasonable doubt, you will acquit." It's saying—apparently, it could be read as saying if you don't find deadly force, you must acquit. Am I reading that wrong?
>
> Court: Let me read it again.
>
> State: It says "if not justified in using deadly force." If you have a reasonable doubt on that, that they were not justified in using it, you must acquit. I believe that's the state of the law . . . .
>
> Court: So what is your problem with the wording? That it's not clear?
>
> Defense: Your Honor, I think my problem comes into play in that it seems to say if you have a reasonable doubt as

to whether or not Michael Rivas and/or Leonard Rivas were justified in using the force they used, if you do not find a reasonable doubt you will acquit.

> Court: If you find the defendants were not justified in using deadly force, if any, against Felix Flores.
>
> State: It says: "You must find that the defendant Michael Rivas and/or Leonardo Rivas was not justified—was not justified in using deadly force but if you have a reasonable doubt thereof, then you have to acquit." It's an affirmative defense. They have to come forward with the evidence, which they've done but it has to be proven beyond a reasonable doubt that they were not justified in using it.
>
> Defense: No, it does not, Your Honor. The defendant doesn't have to prove a defense beyond a reasonable doubt.
>
> Court: Let me look.
>
> State: We have to prove that the defense is not there beyond a reasonable doubt and that's what this paragraph says.
>
> Defense: I think it could be read the other way. I think there's better ways of putting it.

Because Michael properly preserved error in the charge with regard to the application paragraph for self-defense, a reversal is mandated if a review of the record yields a finding that Michael suffered "some harm." *Reeves,* 420 S.W.3d at 816 (citing *Almanza,* 686 S.W.2d at 171). The actual degree of harm must be assessed in light of "(1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record." *Id.*

### a. *The Jury Charge as a Whole*

The charge contains information indicating facts adduced at trial, including the date, location, and manner in which the offenses occurred. In a subsequent section to the self-defense application paragraph for murder, the charge instructed the jury to acquit Michael if they had a reasonable doubt on the issue of self-defense. We, therefore, conclude this factor weighs against a finding of harm. *Cf. Villarreal v. State*, 453 S.W.3d 429, 433 (Tex.Crim.App.2015).

### b. *Arguments of Counsel*

Although at trial the State and defense counsel focused mainly on convincing the jury that the evidence presented at trial supported their version of events, they both discussed the issue of self-defense. Additionally, in closing arguments, Michael's counsel repeatedly referenced the charge and argued the state's failure to prove each element beyond a reasonable doubt "must result in acquittal." Michael himself acknowledges in closing, "[Acquitting] is what the Court tells you in the very next sentence [of the charge]."

Because both the State and the defense argued their case for and against self-defense before the jury, we conclude this factor weighs against a finding of harm. *Id.*

### c. *Entirety of the Evidence*

At trial, the only evidence supporting Michael's self-defense claim came from Michael's own testimony and that of Leonardo. We remain mindful that a "reasonable belief" is a belief that an ordinary and prudent person would hold in the same circumstances as the defendant. *See* TEX PENAL CODE ANN. § 1.07(a)(42) (West Supp. 2015).

The State presented testimony from witnesses who overheard Michael and Leonardo discussing retaliating with violence before Michael sought out his victims. The State's witnesses who observed the shooting uniformly testified that Michael and Leonardo were unprovoked when they shot at Felix, who was unarmed. Forensic evidence corroborated the State's witnesses' testimony. The weight of the probative evidence that the State developed at trial refuting Michael's claim of self-defense was such that, notwithstanding the erroneous application paragraph of which Michael complains, the jury could have found beyond a reasonable doubt that Michael did not have a reasonable belief that self-defense was necessary. *See Lee v. State*, 415 S.W.3d 915, 926 (Tex.App.–Texarkana 2013, pet. ref'd).

Having reviewed the entire jury charge, the arguments of counsel, and the weight of the contested evidence, we cannot conclude Michael suffered harm as a result of the trial court's error. *See Reeves*, 420 S.W.3d at 816. Michael's first point of error is overruled.

## D. Law of Parties Instruction

### 1. *Law of Parties Application Paragraph Requirements*

The Court of Criminal Appeals has consistently held that "an application paragraph that incorporated the law of parties by stating that the defendant 'either acting alone or as a party, as that term has been defined,' sufficiently applied the law of parties to the facts of the case." *Vasquez v. State*, 389 S.W.3d 361, 367 (Tex.Crim.App. 2012) (citing *Chatman v. State*, 846 S.W.2d 329, 332 (Tex.Crim.App.1993)); *see also Marvis v. State*, 36 S.W.3d 878, 880 (Tex. Crim.App.2001) ("[T]he use of the phrase 'acting together' in the application portion of the charge is a reference to the abstract portion, which equates 'acting together' with 'party,'" and the jury could refer

back to other portions of the charge to determine whether the defendant was criminally responsible for conduct).

 "A general reference to the law of parties in the application paragraph is sufficient and is not error" absent an objection by the defendant or a request that the court "narrow[ ] the specific statutory modes of conduct that constitute party liability." *Vasquez*, 389 S.W.3d at 368; *see also Washington v. State*, 449 S.W.3d 555, 568 (Tex.App.–Houston [14th Dist.] 2014, no pet.).

*2. The Charge Conference and the Charge Provided to the Jury*

At trial, Michael did not object to the charge as to the law of parties except to argue that the law of parties should apply exclusively to either murder or conspiracy to murder, but not to both.

Defense: Your Honor, with respect to the conspiracy, I might as well bring it up at this point. As far as I can tell, the jury charge in this case authorizes a conviction of Michael Rivas under the law of parties or party as a conspirator. That's my recollection. If that's the case, *I would ask the Court to order the State to elect between the charge of murder and the charge of conspiracy to murder* because in the absence of an election it would allow Michael Rivas to be convicted of two offenses for the same conduct. That is, he conspired to commit murder and he murdered as a conspirator. It's the same facts, same offense. The State should be required to elect.

Court: Do you have a case on that or anything to direct the Court?

Defense: No, no specific case, Your Honor but I know there's case law that says you can't be convicted of the same offense twice.

Court: Right, I'm aware of that but with regard to this particular.

Defense: Well, I could search more. Do I have anything right now? No.

State: The State submits they're distinct and separate charges, each containing separate elements.... So whether he was involved in a conspiracy or not, they could find him guilty as the primary actor to the murder. So there is no election here because there's several theories upon which they can base that....

There is no other discussion on the record regarding the law of parties.

On appeal, Michael does not maintain that he objected to lack of liability specifically or that he preserved the error at trial. Michael specifically opines that "the trial judge is required to instruct the jury as to the conduct of the person the state claims was the primary actor, the identity of the primary actor, and the type of assistance the state claims imposes criminal responsibility on the defendant as a party." Michael argues the trial court charged the jury erroneously on the law of parties and requests that the case be reversed because it "resulted in harm." We disagree.

The relevant portion of the abstract instruction in the case is herein provided:

A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

Each party to an offense may be charged with commission of the offense.

Each party to an offense may be charged and convicted without alleging that he acted as a principal or accomplice.

A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote

or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense....

If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

The application portion of Michael's jury charge provided:

Now if, bearing in mind the foregoing instructions and definitions, if you find from the evidence beyond a reasonable doubt that on or about the 15th day of October, A.D.2011, in Medina County, Texas, the defendant, MICHAEL A. RIVAS, as alleged in the indictment, acting alone or as a party to the offense, did then and there, intentionally or knowingly cause the death of an individual, namely Felix Flores, by shooting him with a firearm, then you will find the defendant guilty of the offense of murder, and so say by your verdict.

If you do not find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will find the defendant not guilty.

*3. Analysis*

In *Vasquez*, the Court of Criminal Appeals explained that, absent an objection by the defendant, the application paragraph need only include a "general reference to the law of parties." *Vasquez*, 389 S.W.3d at 368. But if the defendant does request "a narrowing of the specific statutory modes of conduct that constitute party liability—whether he 'solicited, encouraged, directed, aided or attempted to

aid' another specified person to commit the offense," the defendant "is entitled to such a narrowing." *Id.; see also Washington*, 449 S.W.3d at 568.

Here, the application paragraph tracked the language of the indictment, adequately referenced the abstract portions of the charge, and included the language " 'either acting alone or as a party' "—all of which equates to a finding of no error. *See Vasquez*, 389 S.W.3d at 367–68; *Yzaguirre*, 394 S.W.3d at 530; *Jackson v. State*, No. 04–11–00499–CR, 2012 WL 5416204, at *5 (Tex.App.–San Antonio Nov. 7, 2012, pet. ref'd) (mem. op., not designated for publication). Moreover, Michael neither objected to the application paragraph nor made a specific request for party-liability at trial. Absent such an objection and request for specificity, Michael is not entitled to such a narrowing. *See Vasquez*, 389 S.W.3d at 368; *Cortez v. State*, No. 04–12–00073–CR, 2013 WL 1640055, at *4 (Tex.App.–San Antonio Apr. 17, 2013, pet. ref'd) (mem. op., not designated for publication). Additionally, Michael concedes he was with Leonardo in the Expedition when the shooting occurred. *Cf. Jaycon v. State*, 651 S.W.2d 803, 807 (Tex.Crim.App.1983); *Vogt v. State*, 421 S.W.3d 233, 240 (Tex. App.–San Antonio 2013, pet. ref'd) (distinguishing *Jaycon* from cases where adequate evidence exists showing the defendant was a participant in a crime).

Michael provides no other argument or case law to support a finding that the application paragraph on the law of parties was inadequate. The jury charge properly instructs the jury regarding Michael's action as a party to the offense of murder. *See Vasquez*, 389 S.W.3d at 366; *see also Vogt*, 421 S.W.3d at 241. Because we conclude that the charge pertaining to the law of parties did not contain error, we need not conduct a harm analysis. *See, e.g., Cortez v. State*, 469 S.W.3d 593, 598 (Tex.

Crim.App.2015). Michael's second point of error is overruled.

## ATTORNEY'S FEES

Michael next contends the evidence is legally insufficient to support the imposition of any attorney's fees under article 26.05(g) of the Texas Code of Criminal Procedure. Michael challenges the assessment of $8,387.50 in attorney's fees. He asserts the trial court found him indigent for purposes of trial and this appeal, and there is no evidence to support a material change in Michael's financial circumstance.

The State does not challenge Michael's last issue on appeal and requests, "this court modify that judgment to delete the assessment of attorney's fees in the judgement and order the district clerk to delete the attorney fees from the bill of costs."

"A defendant who is determined by the court to be indigent is presumed to remain indigent for the remainder of the proceedings in the case unless a material change in the defendant's financial circumstances occurs." TEX.CODE CRIM. PROC. ANN. art. 26.04(p) (West Supp.2015); accord Wiley v. State, 410 S.W.3d 313, 317 (Tex.Crim. App.2013); see also Dieken v. State, 432 S.W.3d 444, 446 (Tex.App.–San Antonio 2014, no pet.).

Here, the record indicates the trial court determined Michael was indigent and appointed counsel to represent Michael pre-indictment on November 22, 2011, and again on September 24, 2012. The appointment was to continue "until the case ... concluded, or until [the appointed attorney was] released by order of the Court."

The record also contains a letter submitted by Michael's court-appointed attorney, dated January 10, 2014, providing the trial court with notice of intent to submit an itemized voucher for representing Rivas.

On January 24, 2014, Michael's trial counsel filed a compensation form with attached time sheets. Four days later, the trial court appointed separate counsel for Michael's appeal. The record indicates no change in Rivas's financial circumstance. See Cates v. State, 402 S.W.3d 250, 251 (Tex.Crim.App.2013) (quoting TEX.CODE CRIM. PROC. ANN. art. 26.04(p)) ("[A] 'defendant who is determined by the court to be indigent is presumed to remain indigent for the remainder of the proceedings in the case unless a material change in the defendant's financial circumstances occurs.'"); see also Ramirez v. State, 432 S.W.3d 373, 377 (Tex.App.–San Antonio 2014, pet ref'd).

To properly impose the attorney's fees on Michael, the trial court had to find, either expressly or implicitly, that a material change occurred and Michael had the ability to pay $8,387.50 in appointed attorney's fees. See TEX.CODE CRIM. PROC. ANN. art. 26.05(g); Wiley, 410 S.W.3d at 317. The trial court did not make an express written or oral finding, and the record does not reasonably support such an implicit finding. See McFatridge v. State, 309 S.W.3d 1, 5–6, 9 (Tex.Crim.App.2010) (requiring "the trial court's determinations [to be] reasonably supported by the evidence").

Because there is no evidence in the record to support the imposition of attorney's fees, and there is no evidence of a material change in Rivas's financial circumstances, the trial court erred in assessing appointed attorney's fees against Rivas.

## CONCLUSIONS

Michael's first and second points of error are overruled. Although we conclude the jury charge as to the self-defense application paragraph was erroneous, Michael did not suffer "some harm" as a result of the trial court's error. See Al-

*manza,* 686 S.W.2d at 171. The jury charge, however, did properly instruct the jury regarding the law of parties. *See Vasquez,* 389 S.W.3d at 366; *see also Vogt,* 421 S.W.3d at 241.

However, because the trial court erred in assessing attorney's fees as costs against Michael, we sustain his third issue on appeal. *See Wiley,* 410 S.W.3d at 320. There are insufficient facts in the record to justify the assessment of attorney's fees. *See* Tex.Code Crim. Proc. Ann. art. 26.05(g). Accordingly, we reform the judgment and bill of costs to delete Michael's requirement to pay attorney's fees, and we affirm the trial court's judgment as reformed.