**Opinion issued August 30, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00101-CR

———————————

**BRIAN DARNELL JOHNSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 405th District Court**
**Galveston County, Texas**
**Trial Court Case No. 13CR3057**

---

## MEMORANDUM OPINION

A jury found appellant, Brian Darnell Johnson, guilty of the offense of

aggravated assault with a deadly weapon.[1]   After appellant pleaded true to the

---

[1]    *See* TEX. PENAL CODE ANN. § 22.02(a) (Vernon 2011).

allegations in two enhancement paragraphs that he had twice been previously convicted of felony offenses, the jury assessed his punishment at confinement for forty years. In five issues, appellant contends that the evidence is legally insufficient to support the jury's implicit rejection of his claim of self-defense and the trial court, in its charge, erred in instructing the jury.

We affirm.

## Background

The complainant, Don Miles, testified that appellant is his "brother" or "half-brother" because they "share the same sister" and were "close." On September 24, 2013, the complainant attended a "family gathering" at "Obie's Pool Hall"—"[a] little, small brick building" with "a few pool tables" and "slot machines." Also, in attendance were appellant, Charles Douglas and Alex,[2] the complainant's cousins, Monique Donald, the complainant's former girlfriend, and Brittany Turner, Donald's friend.[3]

When the complainant saw appellant having a verbal argument with Alex, he tried to "defuse" the situation. However, appellant became "aggressive" and "pretty hotheaded" because the complainant was "taking up for" Alex rather than "be[ing]

---

[2] The complainant did not know Alex's last name.

[3] The complainant testified that Turner is Donald's "cousin"; however, Turner, during her testimony, clarified that she and Donald are "former friend[s]" who "pretend[ed]" to be related.

2

on his side." An argument then "erupt[ed]" between the complainant and appellant, with both men yelling at each other. The argument turned into "a little physical altercation," during which the complainant and appellant "thr[ew] blows." Although the complainant admittedly "threw the first punch," the "fight" consisted of "mutual combat" between himself and appellant. Douglas, Donald, and "everybody . . . in th[e] pool hall at th[e] time" "broke[] . . . up" the fight, which was "short-lived," consisted of "just a couple punches," and involved no weapons.

After the complainant's fight with appellant, "a verbal alternation occurred between" Donald and "the woman" with appellant. The women did not "hit each other," but only "shout[ed]." And after the argument between the two women "broke . . . up," the complainant went outside to leave because the pool hall was going to close and "[t]he police might [have] be[en] [coming]." He then walked to the side of the building and toward the car that he had driven to the pool hall.

While the complainant was talking to Donald outside of the pool hall to "calm [her] down," appellant "c[ame] out[side]" "look[ing] pretty pissed." He told the complainant: "Y'all need to go ahead and leave. You know what I'm saying? You've got a timeframe now -- a 5-second timeframe [to leave]." (Internal quotations omitted.) Appellant said this "over and over" while holding "his hand behind his back" and "look[ing] threatening." The complainant then "start[ed] to approach" appellant because he too was "pissed" and appellant's threats had "started

3

getting to [him]." However, the complainant, who was carrying a "pocket knife" in a "holster[]," did not "intend[] to use any . . . weapons" and did not "threaten[]" appellant. And he did not think that appellant had "any type[] of weapon[]" either.

When the complainant "start[ed] to approach" appellant, he became "kind of weary," "turn[ed] [his] back" to appellant, and walked away to "resume [his] conversation" with Donald. At this time, the complainant's pocket knife continued to remain "holstered" in his "side pocket." He did not have his pocket knife "out," did not "wave" it at appellant, and did not "threaten [appellant] in any way." Nor did he "say that [he] w[as] going to do anything to [appellant] with the knife."

The complainant further testified that when he "turn[ed] [his] back" to appellant, he heard "a boom sound" and "felt [an] impact," "like somebody punching [his] leg"—he had been hit by "a gunshot" on "the back of [his] thigh, right up under [his] butt[ocks]." The complainant then "turned around defensive[ly]" and "pulled" out his pocket knife in a "spur of the moment . . . reaction." When he did so, he saw appellant holding, in his hand, a "gun"—"a revolver[] .38." The complainant said, "Man, you shot me," and he started walking toward appellant, who then "started ringing shots out," "started shooting" and "mov[ing] around." (Internal quotations omitted.) This caused the complainant to retreat and "hop[]" to his car.

As the complainant drove himself, along with Douglas and Alex, to a hospital, blood from his leg covered the driver's seat of his car and a shirt that he had used to

4

try and "keep the blood from . . . flowing all over the [car]seat." He noted that the bullet had "entered" his leg through the "back of [his] thigh" and "stayed lodged in" his leg. The complainant explained that, at the time of trial, the bullet was "still" inside of his leg because removing it would have been "too risky." He further noted that Donald had been "grazed by a bullet," which injured her chin and arm.

Turner testified that she met appellant at the pool hall on the night that "the fighting, the arguing, and the shooting" occurred in September 2013. She had gone to the pool hall to meet Donald, the complainant, and Douglas "[t]o hang [out]." While there, two arguments took place. The first, which began as a verbal argument and "turn[ed] . . . physical," involved Donald and her "auntie." When appellant's "woman" or "girlfriend" "jumped in[to]" the fight, Turner also "g[o]t involved." The fight lasted "about five minutes" and did not involve weapons. And the complainant and Douglas "broke it up."

Turner explained that the second argument involved the complainant and appellant. It started as a "verbal argument," but "turn[ed] into a physical argument" when the complainant hit appellant. The fight did not involve any weapons and only lasted "three minutes." During the fight, the complainant did not "say [that] he had a knife," and Turner did not see a knife on him. After the fight, "everybody [went] their own way." And once Turner heard that "somebody [had] called the police," she and Donald decided to leave the pool hall.

5

As Turner stood outside of the pool hall with Donald, who was saying goodbye to the complainant, appellant "came around the corner of [the building] and started shooting." When Turner heard the "sound of the gun going off," she and the people outside of the pool hall "froze." She saw appellant "standing there with a gun," a "revolver" with a "short" barrel. Turner explained that she actually saw appellant "[s]hooting" and "shots com[ing] out of the gun." And she noted that appellant gave "[n]o warning" before he started shooting the firearm.

Turner also noted that both the complainant and Donald had been hit by "shots" from appellant's firearm. She saw the complainant "g[e]t hit by the second bullet" and "blood gushing from his leg." The complainant, who Turner did not see "with any type of weapon," then "turned around" and "started limping toward[]" appellant. As the complainant "limp[ed] toward[]" appellant, Donald told him that "he needed to go to the hospital," and Donald and Douglas helped the complainant to his car.

When Turner and Donald then got into her car to "follow" the complainant to the hospital, Turner saw "[a] bullet hole" in the windshield "on the driver's side." She also discovered that Donald had a "hole" and "blood dripping" "underneath her chin" where she had been "hit" by a bullet. Finally, Turner noted that she did not see "anybody with a gun," other than appellant, "anybody [with] a knife," or "anybody [with] any other weapons" that night.

6

Jennifer Warfield, appellant's former girlfriend, testified that she and appellant had stopped dating in September 2013 about "a week" "[b]efore the shooting at the pool hall." She was not at the pool hall "when the shooting took place"; however, she did see appellant that night when she "went to pick him up" around 1:30 a.m. Appellant had called Warfield, telling her that "he needed [her] to come get him, that something had happened earlier that night and that might be the last time [that she] got to see him." Appellant "sounded scared and out of breath" on the telephone.

Warfield "picked [appellant] up" in her car, and he sat in the "front" passenger seat as she drove to his uncle's house "on Benson." She parked the car in the driveway of the house, and she and appellant sat in the car for "maybe 30 minutes." During this time, appellant only told Warfield that "he thought somebody was looking for him." They then exited the car and "walked around the block" a couple of times for "30 minutes to an hour," during which time appellant would not tell her "what [had] happened." However, he repeatedly said, "I'm sorry[,] I'm sorry," and he "started crying." (Internal quotations omitted.)

After Warfield and appellant had "made the[ir] second trip around the block," he asked, "[W]hat would happen if somebody started shooting at [them]." A car then "came down . . . the street that intersect[ed] [with] Benson," and appellant "took off running" "[t]o the front door and . . . inside" of his uncle's house.

7

Although Warfield tried to follow him, appellant "shut the door," and she could not get inside. Law enforcement officers then appeared, detained Warfield, searched her, and asked her "who [had] r[u]n into the house." She responded that appellant had run into the house, and she consented to a search of her car. After the search, one of the officers "brought" Warfield over to her car "to show" her a firearm that was under a car seat. When she saw the firearm, she became scared and angry because she "knew" that appellant had put it there.

Warfield noted that she did not own any firearms and had not "allow[ed] anyone else to use [her] car" on the day of the shooting. The first time that she saw the firearm that the law enforcement officer found was when he showed it to her. And, according to Warfield, "nobody," other than appellant, "would have put a gun under [the] seat" in her car.

Texas City Police Department ("TCPD") Officer J. Tucker testified that on September 24, 2013, he was "dispatched" to a hospital after a "shooting," where he met the complainant, who was "grabbing his leg" and "making faces and groans of pain," in the emergency room. The complainant told Tucker that he "got involved in an altercation" with his "[]brother," appellant, at a "club." And "as he was leaving, [appellant] shot him." Tucker also spoke to Donald, who told him that appellant "started recklessly shooting," and to Turner, who said that her car had been

8

"struck by one of the bullets." According to Tucker, the stories of the complainant, Donald, and Turner all "matched."

La Marque Police Department Officer M. Kelemen testified that while on patrol on September 24, 2013, his partner saw two people run across the street near a house "on Benson." When Kelemen "turned [his patrol car] around," the two people "took off running," and Kelemen saw "a female trying to get into the front door of a residence." After the officers detained the woman, she told Kelemen that "[t]he male subject," who was "inside the residence," had "told [her] to run" and "advised [her] that some people were after him from an incident earlier." Kelemen noted that the car parked in the driveway of the house on Benson was "the suspect vehicle . . . in a shooting in Texas City" and he contacted the TCPD because it was handling the investigation of the shooting.

TCPD Officer A. Bjerke testified that on September 24, 2013, he heard that "a La Marque P.D. officer [had] request[ed] . . . assistance [from the TCPD] based on seeing a possible suspect involved in a shooting that [had] occurred in Texas City." Bjerke then proceeded to an address "on Benson" and spoke to Warfield, who had been "detained." When Bjerke searched, with her consent, Warfield's car, he recovered "[a] revolver handgun" from the "passenger side floorboard."[4] Bjerke did

---

[4] The trial court admitted into evidence the firearm, "two rounds," and "one spent casing" that had been recovered from Warfield's car.

9

note that he did not know who owned the firearm, but he explained that a firearm is a deadly weapon.

TCPD Detective E. Mendenhall testified that he was assigned to investigate "a shooting . . . [at] Obie's Pool Hall" on September 24, 2013, and he spoke with the complainant and Donald at the hospital. The complainant, who was in the emergency room, "appeared" to be in pain and had "a bullet hole [in] his right leg." Mendenhall also spoke with Turner, who was "present during the disturbance," and Douglas, who was also "present" and one of appellant's "family member[s]." According to Mendenhall, the information he received from Turner and Douglas "pretty much matched."

Detective Mendenhall further testified that after he received "information that La Marque P.D." had "located a possible suspect," he proceeded to a "location . . . on Benson," where he met Warfield. After he obtained her consent to search her car, he looked into the car "from the passenger side door" and saw "the handle of a gun." Officer Bjerke, not Mendenhall, actually removed the firearm from the car. Mendenhall explained that the firearm "fit[] the description" given "by the witnesses" to the shooting, and when he showed Warfield the firearm in her car, she "freaked out" and was "very surprised by it." And she told Mendenhall that she had "no knowledge of the gun."

10

Appellant testified that he went to the pool hall on September 24, 2013 at around 3:00 p.m., but not to attend a "family outing." He explained that Douglas and Obie Johnson, the owner of the pool hall, are members of his family, but the complainant is not his "brother." Appellant, who had only one drink while at the pool hall, noted that as he was about to leave, he heard the complainant and Alex "talking." When appellant asked whether they were "talking about [him]," the complainant "just walked up to" him and "punched" him in his face. (Internal quotations omitted.) Alex then "jumped in and they were both jumping [him] inside [of] the pool hall."[5] At that time, no one used any weapons, and appellant was not injured. However, he knew that the complainant was carrying a knife because he had the knife "every time [that appellant] had ever s[een] him."

After the fight between appellant and the complainant, "the girls [in the pool hall] immediately started fighting." Subsequently, "everyone [started] leaving" the pool hall, but Obie told appellant to "stay in for a while." "[A]bout ten minutes later," appellant went outside the pool hall with Obie and Douglas. And as he "started going outside to go to the car [that he] was in," the complainant and Alex "jumped on [him] again" and "start[ed] beating [him] up." At first, the complainant

---

[5]     Appellant also testified that as he was "talking" to the complainant's friend, the complainant "intervened" in their conversation. Appellant and the complainant then "got into a shouting argument," and "after that," they "got in a fight." The complainant hit appellant on his chin, causing him to fall to the floor. And then the complainant and Alex "started jumping [him] inside [of] the pool hall."

11

and Alex "beat[]" him with their fists, but then the complainant "pull[ed] his knife out of his belt buckle" and "cut [appellant] on [his] arm four times." Appellant explained that the complainant and Alex hit him "[a] whole bunch of times" while "on top" of him. Then, the complainant "momentarily stopped," "went to his waist," and "pulled out his knife." And appellant could "feel" it as the complainant cut his arm. However, the complainant did not "stab[] any other place on [his] body." Appellant's gun then "fell out of [his] back pocket," and he "shot [the complainant] in his leg."

During the fight, appellant was "[t]erribly afraid" because the complainant had "beat[en] [him] once inside the pool hall." And he feared that "it would be fatal," i.e., the complainant would "kill [him] that night." Appellant explained that the complainant had "always [been] beating up on someone" and he and the complainant had "gotten into it twice before." Further, appellant "used the gun" because he was "on the ground" when the complainant and Alex "started beating [him] up" and the complainant had "cut[]" him with the knife. He fired only two or three shots, hitting the complainant "in the back of his leg." After appellant shot the complainant, he "ran around the [pool hall] building," and the complainant "chased after [him] with [the] knife." The complainant followed appellant "all the way to [his] car," which appellant "jumped into." And as appellant drove away from the pool hall, the complainant tried to "punch[] on the [car's] windows."

Appellant further testified that he drove his car to "615 Benson after the shooting." Although Warfield "came to the house . . . [a]t Benson," she did not drive appellant there. He admitted to sitting in the front-passenger seat of Warfield's car, but he denied that he had placed the firearm under the passenger-side car seat. According to appellant, he had "never [before] seen th[e] gun" found in Warfield's car, and he did not know how it got there. Further, appellant explained that the firearm recovered from Warfield's car was not "the gun" that he had "used" to shoot the complainant, although he did use "[a] .38" "[r]evolver."

Appellant also explained that he did not go to a hospital for treatment of the cuts on his arm because they were not "deep." And he admitted that when he gave a statement to Detective Mendenhall, he told him that he "didn't shoot anybody that night." The "first time" that appellant had ever "mentioned [his] injuries" was during his trial testimony.

On rebuttal, Detective Mendenhall testified that appellant gave him a statement, which the trial court admitted into evidence. While giving his statement, appellant did not "mention" to Mendenhall that he had sustained "any stab wounds" or that the complainant or anyone else had "exhibited or used a knife against him." Appellant did not show Mendenhall any "open cuts or healing cuts from stab wounds," and he did not state that the fight "involved weapons," "he was jumped after the pool hall [had] closed and he shot [the complainant] in self-defense," or he

13

had "use[d] a weapon to safeguard his life." Further, when Mendenhall asked appellant whether "he [had] shot anyone," he responded, "no." (Internal quotations omitted.) Appellant also told Mendenhall that he "walked [away] from the pool hall," and he did not say that "he drove a vehicle away from the pool hall to [a] . . . house." Finally, Mendenhall explained that, during his investigation, no one "gave any information" about appellant being "stabbed."

## Sufficiency of Evidence

In his first issue, appellant argues that the evidence is legally insufficient to support the jury's implicit rejection of his claim of self-defense because "no reasonable jury could have found that [he] was not acting in self-defense when he shot [the complainant]."

We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S. W.2d 866, 867 (Tex. Crim. App. 1988). We give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh

14

evidence, and draw reasonable inferences from the facts.  *Williams*, 235 S.W.3d at 750.  However, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused.  *Id.*

A person is justified in using force against another when and to the degree that he reasonably believes the force is immediately necessary to protect against the other person's use or attempted use of unlawful force.  TEX. PENAL CODE ANN. § 9.31(a) (Vernon 2011).  If a person is justified in using force under section 9.31, he may use deadly force when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force.  *Id.* § 9.32(a) (Vernon 2011).  A "[r]easonable belief" is that which "would be held by an ordinary and prudent man in the same circumstances as the actor."  *Id.* § 1.07(a)(42) (Vernon Supp. 2015) (internal quotations omitted).  "Deadly force" is force "intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury."  *Id.* § 9.01(3) (Vernon 2011) (internal quotations omitted).  The Penal Code justification for self-defense focuses on the existence of some necessity, the circumstances under which the force was used, the degree of force used, and the type of conduct against which the force was used.  *Kelley v. State*, 968

S.W.2d 395, 399 (Tex. App.—Tyler 1998, no pet.). The amount of force used must be in proportion to the force encountered. *Id.*

When a defendant challenges the legal sufficiency of the evidence to support the rejection of a defense such as self-defense, we examine all of the evidence in the light most favorable to the verdict to determine whether a rational jury could have found the accused guilty of all essential elements of the offense beyond a reasonable doubt and against the accused on the self-defense issue beyond a reasonable doubt. *See Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). The defendant bears the burden of producing "some evidence" to support his self-defense claim. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). Once the defendant produces that evidence, the State then bears the burden of persuasion to disprove the defense. *Id.* To satisfy its burden, the State need not produce evidence to disprove the defense; it must only to prove its case beyond a reasonable doubt. *Id.* Moreover, "[d]efensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province[,] and the jury is free to accept or reject the defensive evidence." *Saxton*, 804 S.W.2d at 914. When the evidence is conflicting, we presume that the fact finder resolved the conflicts in favor of the State and defer to that determination. *Clayton v. State*,

235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "A jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory." *Saxton*, 804 S.W.2d at 914.

Here, appellant admitted to shooting the complainant "in the back of [the] leg," and the complainant testified that appellant had shot him. The complainant further explained that when he was outside of the pool hall talking to Donald, appellant "c[ame] out[side]" "look[ing] pretty pissed." He told the complainant: "Y'all need to go ahead and leave. You know what I'm saying? You've got a timeframe now -- a 5-second timeframe [to leave]." (Internal quotations omitted.) Appellant said this "over and over" while holding "his hand behind his back" and "look[ing] threatening." The complainant did not "threaten[]" appellant, but "start[ed] to approach" him until he became "weary," "turn[ed] [his] back" to appellant, and walked away. The complainant did not have his pocket knife "out" as he approached appellant—it was "holstered" in his "side pocket." And he did not "wave" his pocket knife at appellant, "threaten [appellant] in any way," or "say that [he] w[as] going to do anything to [appellant] with the knife."

When the complainant "turn[ed] [his] back" to appellant, he heard a "boom sound" and "felt [an] impact" to his leg. "[A] gunshot" had hit him on "the back of [his] thigh, right up under [his] butt[ocks]." And as the complainant turned back

17

around, he saw appellant holding, in his hand, a "gun."[6] Only after he had been shot, did the complainant "pull[] out" his pocket knife "defensive[ly]" and start walking toward appellant. At this point, appellant "started ringing shots out," "started shooting" and "mov[ing] around," and the complainant retreated to his car.

Turner testified that as she, the complainant, and Donald stood outside of the pool hall, appellant "came around the corner of [the building] and started shooting." When Turner heard the "sound of the gun going off," she "froze" and saw appellant "standing there with a gun." She saw appellant "[s]hooting" and "shots com[ing] out of the gun."[7] Turner noted that she saw the complainant "g[e]t hit by the second bullet" and "blood gush[ing] from his leg." Turner did not see the complainant "with any type of weapon," "anybody with a gun," other than appellant, "anybody [with] a knife," or "anybody [with] any other weapons" that night.

Detective Mendenhall testified that when appellant gave him a statement, he did not "mention" to Mendenhall that he had sustained "any stab wounds" or that the complainant or anyone else had "exhibited or used a knife against him." Appellant did not show Mendenhall any "open cuts or healing cuts from stab wounds," and he did not state that the fight between him and the complainant

---

[6] Officer Tucker testified that the complainant told him that "as he was leaving" the pool hall, appellant "shot him."

[7] Officer Tucker testified that Donald told him that appellant had "started recklessly shooting."

18

"involved weapons," "he was jumped after the pool hall [had] closed and he shot [the complainant] in self-defense," or he had "use[d] a weapon to safeguard his life." Appellant also responded "no" when Mendenhall asked whether "he [had] shot anyone." (Internal quotations omitted.) Finally, Mendenhall testified that, during this investigation of the shooting, no one "gave any information" about appellant being "stabbed."

Appellant directs us to his own testimony in support of his argument that "no reasonable jury could have found that [he] was not acting in self-defense when he shot [the complainant]." Appellant did testify that he was "[t]erribly afraid," thought that the complainant would "kill" him, and he "used the gun" and "shot [the complainant] in the back of his leg" because he was "on the ground" when the complainant and Alex "started beating [him] up" and "cutting" him with a knife.

However, the issue of self-defense is a fact issue to be determined by the jury, which is free to accept or reject the defensive issue. *Saxton*, 804 S.W.2d at 913–14; *Lee v. State*, 259 S.W.3d 785, 791 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). Further, "jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given" the witnesses' testimony; and they may choose to believe or disbelieve any part of any witness's testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981); *Davis v. State*, 177 S.W.3d 355, 358 (Tex. App.—

19

Houston [1st Dist.] 2005, no pet.); *Jaggers v. State*, 125 S.W.3d 661, 672 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

Moreover, it was within the province of the jury to determine what portions of the conflicting testimony to credit and what portions to reject. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Robertson v. State*, No. 01-15-00376-CR, 2016 WL 672528, at *2 (Tex. App.—Houston [1st Dist.] Feb. 18, 2016, no pet.) (mem. op., not designated for publication). And, here, the jury reasonably could have rejected appellant's testimony about his version of the events surrounding the shooting, and it could have reasonably credited the testimony of the complainant and the other witnesses. *See Smith v. State*, 355 S.W.3d 138, 146 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) ("[T]he jury chose not to believe [defendant] and his witnesses' testimony that he acted in defense, either of himself or third persons, when he stabbed [the complainant]."); *Denman v. State*, 193 S.W.3d 129, 132–33 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (jury not required to accept defendant's self-defense claim).

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found the essential elements of the offense of aggravated assault with a deadly weapon beyond a reasonable doubt and could have found against appellant on his self-defense issue beyond a reasonable doubt. *See*

*Saxton*, 804 S.W.2d at 914. Accordingly, we hold that the evidence is sufficient to support the jury's implied rejection of appellant's self-defense claim.

We overrule appellant's first issue.

## Charge Error

In his second and third issues, appellant argues that the trial court, in its charge, erred in not instructing the jury that a reasonable doubt on the issue of self-defense required that he be acquitted and omitting the application paragraph applying the law of self-defense to the facts of the case. And by not doing so, the trial court failed to include the law applicable to the case and apply the facts of the case to the law. *See* TEX. PENAL CODE ANN. § 2.03(d) (Vernon 2011); *Vasquez v. State*, 389 S.W.3d 361, 366–67 (Tex. Crim. App. 2012) (defining "application paragraph"). In his fourth and fifth issues, appellant argues that the trial court, in its charge, erred in not instructing the jury on the presumption of reasonableness or the duty to retreat. And by not doing so, the trial court failed to include the law applicable to the case. *See* TEX. PENAL CODE ANN. §§ 9.31(a), (e)–(f), 9.32(a)–(d); *see also id.* § 2.05(b) (Vernon 2011).

A review of jury-charge error involves a two-step analysis. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005); *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994). First, we must determine whether error actually exists in the charge, and, second, if error does exist, whether sufficient harm resulted

21

from the error to require reversal. *Ngo*, 175 S.W.3d at 743–44; *Abdnor*, 871 S.W.2d at 731–32.

### *Reasonable Doubt and Application Paragraph*

A trial court must instruct a jury by "a written charge distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. ANN. art. 36.14 (Vernon 2007); *McIntosh v. State*, 297 S.W.3d 536, 542 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). In regard to appellant's second and third issues, we note that the Texas Penal Code provides that "[i]f the issue of the existence of a defense is submitted to the jury, the court shall charge that a reasonable doubt on the issue requires that the defendant be acquitted." TEX. PENAL CODE ANN. § 2.03(d). Further, the trial court's charge must apply the law to the facts adduced at trial because the jury must be instructed under what circumstances to convict or acquit. *Gray v. State*, 152 S.W.3d 125, 127–28 (Tex. Crim. App. 2004). "[T]he failure to apply the law of self-defense to the facts of the case and to instruct the jury to acquit if they h[o]ld a reasonable doubt on self-defense [is] error." *Barrera v. State*, 982 S.W.2d 415, 416 (Tex. Crim. App. 1998); *see also Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013) ("[O]nce the jury is charged on a defensive issue, a flaw in that charge is error . . . ."); *Gray*, 152 S.W.3d at 127–28 ("Jury charges which fail to apply the law to the facts adduced at trial are erroneous.").

Here, the trial court charged the jury on the law of aggravated assault with a deadly weapon, and it included a proper application paragraph on aggravated assault. *See* TEX. PENAL CODE ANN. § 22.02(a) (aggravated assault); *Vasquez*, 389 S.W.3d at 366–67 (defining "application paragraph"). The trial court further instructed the jury on the law of self-defense. *See* TEX. PENAL CODE ANN. §§ 9.31, 9.32. However, the trial court did not include an application paragraph applying the law of self-defense to the facts of the case, and it did not specifically instruct the jury to acquit appellant if it held a reasonable doubt on self-defense. *See* TEX. PENAL CODE ANN. § 2.03(d); *Vasquez*, 389 S.W.3d at 366–67 (defining "application paragraph"). This constituted error. *Barrera*, 982 S.W.2d at 416; *see also Derouen v. State*, No. 01-99-01415-CR, 2001 WL 170981, at *1–2 (Tex. App.—Houston [1st Dist.] Feb. 22, 2001, no pet.) (not designated for publication) ("The failure to apply the law of self-defense to the facts of the case and the failure to instruct the jury to acquit if it h[o]ld[s] a reasonable doubt on self-defense constitute error.").

When, as here, a defendant does not object, or states that he has no objection to a jury charge, an error will not result in reversal unless the record shows "egregious harm," such that the defendant was denied a fair and impartial trial.[8] *Warner v. State*, 245 S.W.3d 458, 461–62 (Tex. Crim. App. 2008) (internal

---

[8] In his brief, appellant concedes that he must show egregious harm. Further, appellant's trial counsel stated on the record that appellant had no objection to the trial court's charge.

23

quotations omitted); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (internal quotations omitted). "Egregious harm exists when the record shows that a defendant has suffered actual, rather than merely theoretical, harm from jury-charge error." *Mcintosh*, 297 S.W.3d at 543 (citing *Almanza*, 686 S.W.2d at 174). "Egregious harm consists of error affecting the very basis of the case or depriving the defendant of a valuable right, vitally affecting a defensive theory, or making the case for conviction or punishment clearly and significantly more persuasive." *Id.* Egregious harm is a difficult standard to meet, and it must be determined on a case-by-case basis. *Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002). To determine whether a defendant has sustained harm from an instruction to which he did not object, we consider (1) the entire charge, (2) the state of the evidence, (3) arguments from counsel, and (4) any other relevant information. *Vega*, 394 S.W.3d at 521; *Almanza*, 686 S.W.2d at 171; *Mcintosh*, 297 S.W.3d at 543.

Under the first factor, we examine the entire jury charge to determine the effect the trial court's error may have had on the jury. Here, the trial court (1) instructed and applied the law of aggravated assault with a deadly weapon to the facts of the case; (2) instructed the jury on the law of self-defense; (3) correctly placed the burden on the State to prove each element of the offense beyond a reasonable doubt; and (4) instructed the jury that appellant was not required to prove

his innocence or to produce any evidence. Further, after instructing the jury on the issue of self-defense in its charge, the trial court stated:

> The prosecution has the burden of proving the Defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do so, you must acquit the Defendant.

> In the event you have a reasonable doubt as to the Defendant's guilt after considering all the evidence before you and these instructions, you will acquit him and say by your verdict "Not Guilty."

We presume that the jury followed the trial court's instructions. *Resendiz v. State*, 112 S.W.3d 541, 546 (Tex. Crim. App. 2003). And, accordingly, we conclude that, despite the trial court's errors, the charge, as a whole, adequately conveyed to the jury that it was required to acquit appellant if it had a reasonable doubt as to any element of the offense. *See Zuliani*, 97 S.W.3d at 594 (to meet its burden of persuasion to show defendant did not act in self-defense, State required to prove its case beyond reasonable doubt); *see also Ramirez v. State*, No. 13-05-785-CR, 2009 WL 1567340, at *6–7 (Tex. App.—Corpus Christi Jan. 22, 2009, pet. ref'd) (mem. op., not designated for publication) (under similar circumstances, holding charge, which did not include application paragraph on law of self-defense and did not instruct jury as required by section 2.03(d), did not result in egregious harm to defendant); *Donnell v. State*, No. 05-05-01445-CR, 2008 WL 73398, at *12–15 (Tex. App.—Dallas Jan. 8, 2008, pet. ref'd) (not designated for publication) (no egregious harm, despite trial court's failure to include in its charge reasonable-doubt

25

instruction as to self-defense, where jury charge instructed burden of proof on State, each element of offense had to be proved beyond reasonable doubt, and defendant not required to prove his innocence or produce any evidence).

Under the second factor we consider the state of the evidence and the plausibility of the evidence raising the issue of self-defense. *Villarreal v. State*, 453 S.W.3d 429, 436 (Tex. Crim. App. 2015); *Allen v. State*, 253 S.W.3d 260, 267–68 (Tex. Crim. App. 2008). In doing so, we may consider the witnesses' testimony, appellant's out-of-court statements to law enforcement officers, and the relative weakness of the evidence indicating that appellant acted in self-defense. *Villarreal*, 453 S.W.3d at 436.

Here, almost all of the evidence adduced at trial showed that appellant, rather than the complainant, was the aggressor and the complainant was unarmed when appellant shot him in the back of his leg. *See Villarreal*, 453 S.W.3d at 436 ("The court of appeals erred by failing to consider the strength of the evidence showing that [defendant] was the aggressor and that [the complainant] was unarmed when appellant stabbed him."). For instance, the complainant testified that when he was outside of the pool hall talking to Donald, appellant "c[ame] out[side]" "look[ing] pretty pissed." Appellant told the complainant: "Y'all need to go ahead and leave. You know what I'm saying? You've got a timeframe now -- a 5-second timeframe [to leave]." (Internal quotations omitted.) Appellant said this "over and over" while

holding "his hand behind his back" and "look[ing] threatening." The complainant did not "threaten[]" appellant, but "start[ed] to approach" him until he became "weary," "turn[ed] [his] back" to appellant, and walked away. The complainant did not have his pocket knife "out" as he approached appellant—it was "holstered" in his "side pocket." And he did not "wave" his pocket knife at appellant, "threaten [appellant] in any way," or "say that [he] w[as] going to do anything to [appellant] with the knife."

When the complainant "turn[ed] [his] back" to appellant, he heard "a boom sound" and "felt [an] impact" to his leg. "[A] gunshot" had hit him on "the back of [his] thigh, right up under [his] butt[ocks]." And as the complainant turned back around, he saw appellant holding, in his hand, a "gun." Only after he had been shot, did the complainant "pull[] out" his pocket knife "defensive[ly]" and start walking toward appellant. However, appellant "started ringing shots out," "started shooting" and "mov[ing] around," and the complainant retreated toward his car.

Turner testified that as she, the complainant, and Donald stood outside of the pool hall, appellant "came around the corner of [the building] and started shooting." When Turner heard the "sound of the gun going off," she "froze" and saw appellant "standing there with a gun." And she saw appellant "[s]hooting" and "shots com[ing] out of the gun." Turner noted that she saw the complainant "g[e]t hit by the second bullet" and "blood gush[ing] from his leg." Turner did not see the

complainant "with any type of weapon," "anybody with a gun," other than appellant, "anybody [with] a knife," or "anybody [with] any other weapons" that night.

Further, Detective Mendenhall testified that during his investigation of the shooting, no one "gave any information" about appellant being "stabbed" on the night of the shooting. And Officer Tucker testified that the complainant told him that appellant had "shot him" "as he was leaving" a "club," and Donald told him that appellant had "started recklessly shooting."

Finally, appellant, himself, testified that he shot the complainant "in the *back* of his leg." (Emphasis added.) And although appellant stated that he shot the complainant after being "cut" on his arm "four times" by the complainant's knife, appellant admitted that he did not go to a hospital to have the cuts to his arm treated because they were not "deep." Further, appellant admitted that he had previously denied shooting anyone in his statement to law enforcement officers. And he admitted that the "first time" that he had ever "mentioned his injuries" was during his trial testimony.

Further, in his statement to Detective Mendenhall, which the trial court admitted into evidence, appellant never raised the issue of self-defense, nor did he state that he had shot the complainant in response to the complainant "cutting" him with a knife. And Mendenhall testified that when appellant gave the statement, appellant did not "mention" that he had sustained "any stab wounds" or that the

28

complainant or anyone else had "exhibited or used a knife against him." Appellant did not show Mendenhall any "open cuts or healing cuts from stab wounds," and he did state that the fight between him and the complainant "involved weapons," "he was jumped after the pool hall [had] closed and he shot [the complainant] in self-defense," or he had "use[d] a weapon to safeguard his life." Appellant also responded "no" when Mendenhall asked him whether "he [had] shot anyone." (Internal quotations omitted.)

In short, none of the witnesses at trial corroborated appellant's version of events, and neither did his own statement to law enforcement officers. *See Villarreal*, 453 S.W.3d at 437–40 (second factor weighs against egregious harm where defendant's "out-of-court statements were internally inconsistent with his claim of self-defense"). In other words, no evidence, other than appellant's own testimony, supported his claim of self-defense. *See Villarreal*, 453 S.W.3d at 437–39; *see also Gonzalez v. State*, No. 08-11-00147-CR, 2012 WL 4101900, at *2–3 (Tex. App.—El Paso Sept. 19, 2012, pet. ref'd) (not designated for publication) (defendant not egregiously harmed by erroneous jury charge where defendant's testimony regarding self-defense uncorroborated and "contradicted by evidence the State developed at trial").

Here, an examination of the entire record reveals that appellant's defensive evidence was weak, and it is unlikely that appellant was harmed as a result of the

trial court's jury charge errors. *See Villarreal*, 453 S.W.3d at 437–39; *see also Allen*, 253 S.W.3d at 267–68 (even had jury been properly instructed, "not likely" it would have found in defendant's favor as to defensive issue); *Rivas v. State*, 486 S.W.3d 640, 652 (Tex. App.—San Antonio 2016, pet. ref'd) ("The weight of the probative evidence that the State developed at trial refuting [defendant's] claim of self-defense was such that, notwithstanding the erroneous application paragraph . . . , the jury could have found beyond a reasonable doubt that [defendant] did not have a reasonable belief that self-defense was necessary."). And the mere existence of conflicting testimony relating to the details of the shooting is not "indicative of egregious harm." *Villarreal*, 453 S.W.3d at 436–39. Further, it is likely that the jury's decision on the issue of self-defense turned on credibility and was not influenced by error in the jury charge. *See Ramirez*, 2009 WL 1567340, at *6–7; *Donnell*, 2008 WL 73398, at *13–14.

Under the third factor, we consider the argument of counsel. During closing argument, appellant's trial counsel argued extensively regarding self-defense, explaining that appellant "protected himself, which is allowed under Texas law," and "[i]f you're afraid for your life, you have a right to self-defense." Appellant's counsel also applied the facts of this case to the general self-defense instruction included in the trial court's charge to the jury. In regard to self-defense, counsel stated:

It's not as complicated as it sounds. Read the definition, look at it from the person who's being attacked to the degree that [the] actor reasonably believes that force is immediately necessary to protect oneself. The next whole page is still about self-defense, also. The same kind of things, though. If someone's attacking you and they have a deadly weapon, a knife, and you are choosing to use a deadly weapon to protect yourself, see if that fits this definition. If this is the expectation, if such person -- a reasonable expectation of fear or death, and that's what [appellant] said. He was afraid he was going to die. The man is stabbing him, a man that always carries a knife. He carried a gun, but now he carries just a knife. Was [appellant] -- have a reasonable expectation of fear of death? Yes. He said he did. He was scared.

Last paragraph on there, you should put yourself in the Defendant's position at that time and view from his standpoint alone. It's not whether [the complainant] was intending -- no. If you're afraid for your life, you have a right to self-defense. It's always the burden of the State to prove all the case -- to prove every bit of the elements. That's what they have to do. I ask you to read over the elements. I ask you to look at it and consider it, take your time; and when it comes to it, I'm asking you to -- on the line that says "not guilty," I'm asking the foreperson of the jury to write their name right there. . . .

During closing argument, appellant's trial counsel also reiterated repeatedly that appellant had been "confronted by [the complainant] more than once"; the complainant was "threatening, bossy, intimidating," and "a dangerous man," who "always carrie[d] a knife"; and the complainant had "just got in a fight with [appellant] twice and [had been] threatening him." Appellant's trial counsel also repeatedly told the jury that the complainant had "jumped" appellant, appellant was "afraid for his life," appellant "saw [the complainant] bring out a knife," and he was "afraid he was going to die." *See Linden v. State*, 347 S.W.3d 819, 822–23 (Tex.

31

App.—Corpus Christi 2011, pet. ref'd) (trial court's error in jury charge did not cause egregious harm where defendant's counsel during closing argument "argued at length" regarding self-defense theory); *Barrera v. State*, 10 S.W.3d 743, 745–46 (Tex. App.—Corpus Christi 2000, no pet.) (defendant's counsel "discussed self-defense in his argument before the jury" and "jury was given a general instruction on the law of self-defense").

Finally, we note that the State explained to the jury during voir dire the concept of self-defense, emphasizing that "in Texas . . . a person can be justified in using force against another person when and to the degree [he] reasonably believe[s] that the force is immediately necessary . . . to protect against the other person's force or attempted use of force." And the trial court also told the jury that a finding of "self-defense" would not result in a "conviction" and "[i]f the jury found that the [d]efendant was entitled to use self-defense in his actions, then [it] would not get to a punishment phase" of trial. *See Gonzalez*, 2012 WL 4101900, at \*4 (statements made during voir dire regarding self-defense relevant to determining egregious harm).

Accordingly, we hold that the trial court's error in not specifically instructing the jury to acquit appellant if it had a reasonable doubt on the issue of self-defense and not including an application paragraph applying the law of self-defense to the facts of the case did not cause egregious harm to appellant.

We overrule appellant's second and third issues.

## *Presumption of Reasonableness*

In his fourth issue, appellant argues that the trial court, in its charge, erred in not instructing the jury on the presumption of reasonableness because "the evidence demonstrates that [the complainant] may have been committing or attempting to commit murder," "[t]here [i]s evidence . . . that [appellant] did not provoke" the complainant, and "there [i]s evidence . . . that [appellant] was not otherwise engaged in criminal activity." *See* TEX. PENAL CODE ANN. §§ 9.31(a), 9.32(a)–(b); *see also id.* § 2.05(b).

Texas Penal Code sections 9.31(a) and 9.32(b) provide that an actor's belief that force, or deadly force, was immediately necessary is presumed to be reasonable if he:

> (1)  knew or had reason to believe that the person against whom the force[, or deadly force,] was used:
>
> > (A)  unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment;
> >
> > (B)  unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment; or
> >
> > (C)  was committing or attempting to commit aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery;

33

(2)   did not provoke the person against whom the force was used; and

(3)   was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

*Id.* §§ 9.31(a), 9.32(b).  A statutory presumption favoring the defendant "must be submitted to the jury" "if there is sufficient evidence of the facts that give rise to the presumption," "unless the court is satisfied that the evidence as a whole clearly precludes a finding beyond a reasonable doubt of the presumed fact."  *Id.* § 2.05(b)(1); *Morales v. State*, 357 S.W.3d 1, 7 (Tex. Crim. App. 2011).  Here, the State argues that appellant was not "entitled to an instruction on the presumption of reasonableness" provided in sections 9.31 and 9.32 "because the evidence before the [trial] court proved that [appellant] was engaged in criminal activity."

Although "criminal activity" as it is used in Chapter 9 of the Texas Penal Code is undefined, we give effect to the plain meaning of statutory language as "the best indicator of legislative intent."  *Shipp v. State*, 331 S.W.3d 433, 437 (Tex. Crim. App. 2011).  And courts have held that "criminal activity" "can be broadly construed" to "encompass any activity that constitutes a crime."  *Barrios v. State*, 389 S.W.3d 382, 393 (Tex. App.—Texarkana 2012, pet. ref'd).

The unlawful possession of a firearm by a convicted felon is a third-degree felony offense. TEX. PENAL CODE ANN. § 46.04(a), (e) (Vernon 2011). Felonies fall within the type of criminal activity prohibited by sections 9.31(a) and 9.32(b).  *See*

34

*Larrinaga v. State*, No. 02-14-00199-CR, 2015 WL 4730710, at *3 (Tex. App.—

Fort Worth Aug. 6, 2015, pet. ref'd) (mem. op., not designated for publication); *see*

*also McCurdy v. State*, No. 06-12-00206-CR, 2013 WL 5433478, at *4 (Tex. App.—

Texarkana Sept. 26, 2013, pet ref'd) (mem. op., not designated for publication)

(defendant engaged in criminal activity by being felon in unlawful possession of

firearms); *Davis v. State*, No. 05-10-00732-CR, 2011 WL 3528256, at *10–11 (Tex.

App.—Dallas Aug. 12, 2011, pet. ref'd) (not designated for publication) (defendant

not entitled to presumption because he was felon prohibited from possessing

firearm).

Here, appellant admitted that he had previously been convicted of several

"felonies," including "[b]urglary of a habitation" and "unauthorized use of

a . . . vehicle," and used a firearm to shoot the complainant.[9] *See* TEX. PENAL CODE

ANN. §§ 30.02(a), (c)(2) (burglary of habitation felony offense), 31.07(a)–(b)

(Vernon 2011) (unauthorized use of vehicle felony offense), 46.04(a), (e) (unlawful

possession of firearm by convicted felon felony offense); *Graves v. State*, 452

---

[9]  The trial court admitted evidence of appellant's criminal record, which established
that he was convicted of the second-degree felony offense of burglary of a habitation
on March 13, 2000 and February 11, 2010, the first-degree felony offense of
burglary of a habitation on November 12, 2001, and the state-jail felony offense of
unauthorized use of a vehicle on January 13, 1998. *See* TEX. PENAL CODE ANN.
§§ 30.02(a), (c)(2) (burglary of habitation), 31.07(a)–(b) (Vernon 2011)
(unauthorized use of vehicle); *see also id.* § 12.42(b) (Vernon Supp. 2015) (habitual
offender statute elevates second-degree felony offense to first-degree felony
offense).

S.W.3d 907, 913 (Tex. App.—Texarkana 2014, pet. ref'd) (statute requires "criminal activity" to occur at time force or deadly force used); *see also Davis*, 2011 WL 3528256, at *10–11 ("It is undisputed that appellant possessed a firearm in violation of the law at the time he used deadly force because he was a convicted felon prohibited by law from possessing a firearm."). This removed the need to instruct the jury that appellant's belief that force, or deadly force, was immediately necessary was presumed reasonable. Accordingly, we hold that the trial court did not err in not instructing the jury on the presumption of reasonableness.

We overrule appellant's fourth issue.

### *Duty to Retreat*

In his fifth issue, appellant argues that the trial court, in its charge, erred in not instructing the jury on the duty to retreat because the evidence shows that he was "legally on his uncle's property at the time that he was attacked by [the complainant]," he was not "committing any other criminal activity at the time he was attacked by [the complainant]," and he "did not provoke [the complainant]." *See* TEX. PENAL CODE ANN. §§ 9.31(e), (f), 9.32(c), (d).

Texas Penal Code sections 9.31(e) and 9.32(c) provide:

A person who has a right to be present at the location where the force[, or deadly force] is used, who has not provoked the person against whom the force[, or deadly force] is used, and who is not engaged in criminal activity at the time the force[, or deadly force] is used is not required to retreat before using force[, or deadly force] as described by this section.

*See id.* §§ 9.31(e), 9.32(c). Further, sections 9.31(f) and 9.32(d) state that in determining whether the person described in sections 9.31(e) or 9.32(c) reasonably believed that the use of force, or deadly force, was necessary, a fact finder may not consider whether he failed to retreat. *See id.* §§ 9.31(f), 9.32(d).

As previously discussed, a statutory presumption favoring the defendant "must be submitted to the jury" "if there is sufficient evidence of the facts that give rise to the presumption," "unless the court is satisfied that the evidence as a whole clearly precludes a finding beyond a reasonable doubt of the presumed fact." *Id.* § 2.05(b)(1); *Morales*, 357 S.W.3d at 7. Here, appellant had no duty to retreat only if he was "not engaged in criminal activity" at the time he shot the complainant. *See* TEX. PENAL CODE ANN. §§ 9.31(e), 9.32(c); *Morales*, 357 S.W.3d at 5 ("The[] 'no duty to retreat' provisions are not all-encompassing. By their very language, they do not apply . . . if the defendant was engaged in criminal activity at the time."). Because appellant was admittedly a convicted felon in unlawful possession of a firearm at the time that he shot the complainant, he was not entitled to an instruction that he had no duty to retreat. *See* TEX. PENAL CODE ANN. § 46.04(a), (e) (unlawful possession of firearm by convicted felon third-degree felony offense); *Larrinaga*, 2015 WL 4730710, at *2–3 (felony, such as unlawful possession of a firearm by convicted felon, falls within type of criminal activity prohibited by sections 9.31 and

9.32); *Graves*, 452 S.W.3d at 913 (statute requires "criminal activity" to occur at time force or deadly force used).

Accordingly, we hold that the trial court did not err in not instructing the jury on the duty to retreat.

We overrule appellant's fifth issue.

## Conclusion

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings, Massengale, and Huddle.

Do not publish. TEX. R. APP. P. 47.2(b).